AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Middle District of Louisiana

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>The Premises Known as Acadian Diagnostic<br>Laboratories, LLC, 11842 Justice Avenue, Baton Rouge,<br>Louisiana 70816 | )<br>)<br>)<br>)  Case No.  19- MJ - 111<br>)<br>)<br>) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ Middle _____ District of _____ Louisiana _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18:1347 | Health Care Fraud |
| 18:1349 | Conspiracy to Commit Health Care Fraud |
| 42:1320a-7b | Soliciting and Receiving Kickbacks Involving a Federal Health Care Program |

The application is based on these facts:

See attached Affidavit

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Wes Root, HHS-OIG
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 9/24/19

_____
*Judge's signature*

City and state:  Baton Rouge, Louisiana

Hon. Richard L. Bourgeois, Jr., U.S. Magistrate Judge
*Printed name and title*

# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

IN THE MATTER OF THE SEARCH OF   :
THE PREMISES KNOWN AS ACADIAN   :   MAGISTRATE NO. 19- mj - 111
DIAGNOSTIC LABORATORIES, LLC,   :
11842 JUSTICE AVENUE, BATON ROUGE,  :   **UNDER SEAL**
LOUISIANA 70816   :

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

Your Affiant, Special Agent Wes Root, being duly sworn, deposes and says as follows:

## I.   IDENTITY AND EXPERIENCE OF THE AFFIANT

1.    I am a Special Agent with the United States Department of Health and Human

Services ("HHS"), Office of Inspector General ("OIG"), and have been employed since August

2015. I am currently assigned to the Baton Rouge, Louisiana Field Office, and am charged with

investigating violations of federal law. Additionally, I am an attorney licensed to practice in

Louisiana (Bar #34064). Prior to joining the Baton Rouge Field Office, I served on multiple details

including to the Office of Counsel to the Inspector General and as a Special Trial Attorney for the

United States Department of Justice. During my tenure as a federal law enforcement officer, I

have worked cases with federal, state, and local agencies and have used numerous investigative

techniques, including, but not limited to, electronic surveillance, physical surveillance, interviews

of witnesses, use of confidential informants, analysis of phone, bank, and other records, and

execution of search and seizure warrants.

2.    As a Special Agent with HHS-OIG, I am currently tasked with conducting

investigations into violations of federal health care fraud laws. I have received extensive training

in investigations of fraud related to the United States health care system, including schemes to

defraud Medicare and Medicaid. Since 2015, I have been participating in the DOJ's Baton Rouge

Medicare Fraud Strike Force, which includes Special Agents from HHS-OIG and the Federal Bureau of Investigation ("FBI"), as well as Investigators from the Louisiana Department of Justice Medicaid Fraud Control Unit ("MFCU"). In that role, I have participated in the execution of search and seizure warrants in cases involving violations of federal law including, but not limited to, Title 18, United States Code, Section 1347 (Health Care Fraud), Title 18, United States Code, Section 1349 (Conspiracy to Commit Health Care Fraud), and Title 42, United States Code, Section 1320a-7b (Soliciting and Receiving Kickbacks Involving a Federal Health Care Program).

## II.   **PURPOSE OF THE AFFIDAVIT**

3.    I make this affidavit in support of an application for a warrant to search the property identified below, and more fully described in Attachment A, attached hereto and incorporated as if fully set forth herein:

   a.    The current business location, inclusive of all buildings, structures, and appurtenances thereof, for Acadian Diagnostic Laboratories, LLC, at 11842 Justice Avenue, Baton Rouge, Louisiana 70816 (the "SUBJECT PREMISES").

4.    As set forth herein, there is probable cause to believe that located at the SUBJECT PREMISES exists evidence of crime, fruits of crime, instrumentalities of crime, and property used to commit crime, more fully described in Attachment B, attached hereto and incorporated as if fully set forth herein, related to possible violations of Title 18, United States Code, Sections 1347 and 1349 (Health Care Fraud and Conspiracy to Commit Health Care Fraud), and Title 42, United States Code, Section 1320a-7b (Soliciting and Receiving Kickbacks Involving a Federal Health Care Program) (collectively, the "TARGET OFFENSES"). I request authority to search the entire SUBJECT PREMISES, including any computer and storage media located therein where the items

specified in Attachment B may be found, and to seize all items listed in Attachment B as evidence, fruits, and instrumentalities of crime.

5.     Your Affiant has been investigating the activities of Acadian Diagnostic Laboratories, LLC ("ACADIAN"), physically located at the SUBJECT PREMISES, in the Middle District of Louisiana, as well as related persons and entities, as part of a joint investigation with HHS-OIG, the FBI, and MFCU (collectively, the "Investigative Team").

6.     Based on the results of the joint investigation, summarized in this affidavit, there is probable cause to believe that ACADIAN has engaged in violations of federal law, specifically the TARGET OFFENSES.  As detailed below, ACADIAN operates as a diagnostic laboratory, through which various owners, operators, and employees committed the TARGET OFFENSES.

7.     The investigation has included, among other things, a review of public records, records obtained from third parties, a review of Medicare claims data, interviews of witnesses, use of the grand jury, and physical and electronic surveillance.

8.     I am personally involved in this investigation along with the Investigative Team. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish the probable cause to believe that evidence, fruits, and instrumentalities of violations of the TARGET OFFENSES, further described in Attachment B and incorporated herein by reference, are currently located at the SUBJECT PREMISES, further described in Attachment A and incorporated herein by reference.

III.    **OVERVIEW OF THE FRAUDULENT SCHEME**

9.     The investigation to date has revealed that from approximately September 2016 to the present, ACADIAN, and individuals associated with ACADIAN, among other things, illegally

paid millions of dollars in health care kickbacks in exchange for referrals of DNA samples, urine samples, and other items, so that cancer genetic testing, urine drug testing, and other diagnostic testing could be performed, irrespective of any medical necessity, and subsequently billed to Medicare, generating millions of dollars in reimbursements for medically unnecessary diagnostic testing.

## IV.    **JURISDICTION**

10.    This Court has jurisdiction to issue the requested warrant because acts in furtherance of the offenses under investigation occurred within the Middle District of Louisiana, including the submission of fraudulent claims to Medicare and other insurers for laboratory services that were procured through unlawful kickback payments and that were not medically necessary. *See* Fed. R. Crim. P. 42(b).

## V.    **THE MEDICARE PROGRAM**

11.    Medicare is a federally funded health insurance program that provides health benefits to individuals who are 65 years of age or older or disabled, and it is a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).  Medicare is administered by HHS through its agency, the Centers for Medicare and Medicaid Services ("CMS").

12.    Individuals who receive benefits under Medicare are referred to as Medicare "beneficiaries."  Beneficiaries are eligible to receive a variety of services, including hospital services ("Part A"), physician services ("Part B"), and prescription drug coverage ("Part D").  Part B covers outpatient physician services, such as office visits, minor surgical procedures, and laboratory services, such as genetic testing and toxicology testing, when certain criteria are met.

13.    "Providers" include clinical laboratories, physicians, and other health care providers who provide services to beneficiaries.  In order to bill Medicare, a provider must submit

an enrollment application to Medicare.  The enrollment application contains certification statements that the provider must agree to before enrolling with Medicare.  Specifically, the certification statement sets forth, in part, that the provider agrees to abide by the Medicare laws, regulations, and program instructions and will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare.

14.    A Medicare "provider number" is assigned to a provider upon approval of the provider's Medicare application.  A provider may use that provider number to file claims with, or "bill" Medicare to obtain reimbursement for services rendered to beneficiaries.

15.    When seeking reimbursement from Medicare, providers submit the cost of the service provided together with the appropriate "procedure code," as defined by the American Medical Association, and set forth and maintained in the Current Procedural Terminology ("CPT") Manual.  The CPT Manual, which is a universally recognized system of medical services coding, assigns numeric designations, or CPT codes, to individual medical procedures.  Additionally, the CPT Manual defines the procedural and medical requirements that must be met in order for a provider to bill for a particular medical service.  A related set of codes is the Healthcare Common Procedure Coding System ("HCPCS").  HCPCS codes are alphanumeric codes developed by CMS as a complementary coding system to the CPT Manual.

16.    Medicare contracts with private companies in various jurisdictions to process claims, determine coverage rules, and provide reimbursement.  Medicare currently contracts with Novitas Solutions, Inc. ("Novitas") to administer the Medicare program in Louisiana, including the enrollment of providers and the processing of claims for services rendered to Medicare beneficiaries.

17.    This investigation concerns claims submitted to Medicare for Part B laboratory services, namely, cancer genetic testing and urine drug testing.

18.    The Social Security Act, Title 42, United States Code, Section 1395y(a)(1)(A) states that no Medicare payment shall be made for items or services that "are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of malformed body member." As a condition of Medicare payment, a physician or other Medicare provider must certify that the services performed were medically necessary. 42 U.S.C. § 1395n(a)(2)(B).

19.    Further, Title 42, Code of Federal Regulations, Section 410.32(a) provides, "All diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem." "Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." *Id.*

20.    When submitting claims to Medicare for reimbursement, providers certify that: (1) the contents of the forms are true, correct, and complete; (2) the forms are prepared in compliance with the laws and regulations governing Medicare; and (3) the services purportedly provided, as set forth in the claims, are medically necessary.

21.    Medicare requires providers to retain medical and other documentation supporting claims for services at their premises and to produce those documents upon request.

## VI.    TARGET OFFENSES

### Health Care Fraud

22.    Title 18, United States Code, Section 1347 prohibits health care fraud.  It provides, "Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice—

    a.    to defraud any health care benefit program; or

    b.    to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program,

in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both."

23.    Title 18, United States Code, Section 1349 provides that any person who attempts or conspires to commit health care fraud shall be subject to the same penalties as those set forth in Title 18, United States Code, Section 1347.

24.    Title 18, United States Code, Section 24(b) defines a "health care benefit program" as "any public or private plan . . . affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service, for which payment may be made under the plan."

### Federal Anti-Kickback Statute

25.    The Federal Anti-Kickback Statute, Title 42, United States Code, Section 1320a-7b, prohibits the payment or receipt of "any remuneration" in exchange for "referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program."

26.     When enrolling as a Medicare provider, physicians, clinical laboratories, and others must certify that they will comply with the Medicare laws, regulations, and program instructions, including the Federal Anti-Kickback Statute.

## VII.   MEDICARE COVERAGE FOR CANCER GENETIC TESTING

27.     Clinical laboratories offer cancer genetic testing, also referred to as "CGx," in order to identify hereditary cancer risks.  These tests can indicate an increased risk of developing certain cancers in the future, but do not detect existing cancer.

28.     Medicare regulations provide coverage for certain cancer screening tests of beneficiaries, such as mammograms and colonoscopies.  However, cancer genetic testing, which does not screen for existing cancer but indicates a risk of developing certain cancers in the future, is covered by Medicare only when there is a personal history of cancer (as opposed to a family history of cancer), the testing is ordered by a treating physician, and the testing is medically necessary.  Of course, even though Medicare does not cover cancer genetic testing when there is no personal history of cancer, individuals may still to choose to undergo such testing and pay for it through other means.

29.     Medicare publishes guidance regarding what services it does and does not cover in a variety of publications, including National Coverage Determinations ("NCDs").

30.     Specifically regarding cancer genetic testing, Medicare issued NCD 90.2 (Next Generation Sequencing) (effective Mar. 16, 2018).  NCD 90.2 states, "Clinical studies show that genetic variations in a patient's cancer can, in concert with clinical factors, predict how each individual responds to specific treatments."  Results of genetic testing can "contribute to predicting a patient's response to a given drug: good, bad, or none at all."  In other words, for a beneficiary who has been diagnosed with cancer, genetic testing can assist with that patient's treatment.

31.     Accordingly, under NCD 90.2, Medicare covers genetic testing using Next Generation Sequencing as "reasonable and necessary" so long as: the testing is "ordered by a treating physician"; the beneficiary has "either recurrent, relapsed, refractory, metastatic, or advanced stage III or IV cancer"; and the beneficiary has "decided to seek further cancer treatment," among other requirements.  In NCD 90.2, Medicare made it clear to providers that Medicare does not reimburse for genetic testing performed to determine the likelihood that a beneficiary will develop cancer in the future.  Rather, Medicare will only pay for genetic testing performed to aid in the treatment of a beneficiary with a current personal diagnosis of cancer.

32.     Novitas is the Medicare Administrative Contractor for Medicare's Jurisdiction JH, which includes Louisiana and surrounding states.  Medicare Administrative Contractors such as Novitas issue Local Coverage Determinations ("LCDs") governing reimbursement of services in the contractors' coverage areas.

33.     In 2015, Novitas issued LCD L35062 (Biomarkers Overview) (effective Oct. 1, 2015), which governs the circumstances in which Medicare considers genetic testing medically necessary (and thus properly reimbursable).  Under LCD L35062, "Medicare considers genetic testing medically necessary to establish a molecular diagnosis of an inheritable disease when all of the following criteria are met:"

- "The beneficiary must display clinical features of an associated disease, but . . . molecular testing for carrier status or family studies is considered screening and is statutorily excluded from coverage; and

- The result of the test will directly impact the treatment being delivered to the beneficiary; and

- A definitive diagnosis remains uncertain after history, physical examination, pedigree analysis, genetic counseling, and completing of conventional diagnostic studies."

34.     In addition, Notivas issued LCD L36715 (BRCA1 and BRCA2 Genetic Testing) (effective Dec. 1, 2016).  Certain patterns of breast and ovarian cancer are linked to the BRCA1 and BRCA2 genes.  Medicare covers genetic testing of the BRCA1 and BRCA2 genes for persons with a "[p]ersonal history of breast, ovarian, pancreatic or prostate cancer," among other criteria. *Id.*  However, "[t]esting of an unaffected Medicare eligible individual or family member is considered not reasonable and necessary." *Id.*  And "BRCA1/BRCA2 genetic testing is considered not reasonable and necessary, thus it is non-covered, for . . . [g]enetic screening in the general population," as well as "[t]esting of individuals with no personal history of breast, ovarian," or certain other cancers. *Id.*  Again, "[s]uch testing is considered screening and is excluded by Medicare statute." *Id.*  As with NCD 90.2, LCD L36715 requires a personal history of cancer for genetic testing to be covered by Medicare.[1]

35.     In 2019, the government spoke with a Medicare expert employed by Novitas.  The expert confirmed that Medicare does not pay for all preventative medicine or screenings.  Congress has authorized payment for certain screening tests, such as annual mammograms, colonoscopies, digital prostate exams and annual "wellness" visits, among others.  Congress has *not*, however, authorized payment for cancer genetic screening, i.e., testing designed solely to let beneficiaries

---

[1] Other Medicare Administrative Contractors have issued LCDs similar to those of Notivas.  For example, Palmetto, a Medicare Administrative Contractor for Jurisdiction JJ, issued LCD L36082 (BRCA1 and BRCA2 Genetic Testing) (effective Oct. 5, 2015), which states, "To be eligible for Medicare coverage, the individual being tested must have signs or symptoms of breast . . ., ovarian . . ., pancreatic . . ., or prostate cancer" and meet other criteria.  "Genetic testing for a known mutation in a family is a covered service for individuals with signs and/or symptoms of cancer.  Testing of an unaffected Medicare eligible individual or family member is not a covered Medicare benefit." *Id.*

who have no symptoms of cancer know whether they have mutations that might cause cancer in the future.

36.     The Medicare expert further stated that Medicare does not consider cancer genetic testing to be medically necessary unless (i) a beneficiary is currently being treated for cancer or is exhibiting symptoms that the beneficiary's physician believes could be related to a the beneficiary having cancer, (ii) the test is ordered by the physician who is treating the beneficiary for cancer or cancer symptoms, and (iii) the physician who orders the test uses the test results to treat the beneficiary's cancer or cancer symptoms.  Medicare does not reimburse for cancer genetic testing in beneficiaries who exhibit no symptoms of cancer.

## VIII.   SUBJECT REMISES AND RELEVANT ENTITIES AND INDIVIDUALS

37.     ACADIAN is a Louisiana limited liability company with its principal place of business at 11842 Justice Avenue, Baton Rouge, Louisiana 70816, within the Middle District of Louisiana.  ACADIAN also operates premises at 11606 Southfork Avenue, Suites 102, 103, 104, 500, and 501, Baton Rouge, Louisiana 70816.

38.     The Chief Executive Officer is Terry Wilks ("WILKS"), and the Chief Financial Officer and registered agent is Kevin Hanley ("HANLEY").

39.     ACADIAN operates as a clinical laboratory that provides genetic, toxicology, and other types of testing, to Medicare beneficiaries and others.

40.     From on or about January 1, 2016, and continuing through on or about August 20, 2019, for all services rendered by ACADIAN (cancer genetic testing, urine drug testing, and other testing services), ACADIAN submitted over $229 million in claims to Medicare, and was reimbursed over $42 million.  During the same time period, ACADIAN submitted over $132

million in claims to Medicare for cancer genetic testing services, and was reimbursed over $21 million.

41.    Archer Diagnostics LLC ("Archer") is a South Carolina limited liability company with its principal place of business at 300B American Legion Road, Greer, South Carolina 29651. The registered agent of Archer is Mark Allen ("ALLEN"). Archer operates as a medical sales and marketing company.

42.    REMN Management LLC ("REMN") was a Florida limited liability company with its principal place of business at 13902 N. Dale Mabry Highway, Tampa, Florida 33618. The managers of REMN were Richard Epstein ("EPSTEIN") and Mike Nolan ("Nolan"), and EPSTEIN was the registered agent. REMN filed for voluntary dissolution on or about March 15, 2019.

43.    Comprehensive Telcare, LLC ("Comprehensive Telcare") was a Florida limited liability company with its principal place of business at 13902 N. Dale Mabry Highway, Tampa, Florida 33618. The managers of Comprehensive Telcare were EPSTEIN and Nolan, and EPSTEIN is the registered agent. Comprehensive Telcare filed for voluntary dissolution on or about March 15, 2019.

44.    JL Management, LLC ("JL Management") is a Wyoming limited liability company located at 30 N. Gould Street, Sheridan, Wyoming. Bank records for JL Management contain a signature card signed by ALLEN and EPSTEIN. The corporate resolution also shows the Wyoming address and lists ALLEN as "signer" and EPSTEIN as "manager." The bank records are addressed to 300B American Legion Road, Greer, South Carolina, which is the same address as Archer. JL Management sometimes did business under the name "JL Billing."

45.     Lotus Health Telemed LLC ("Lotus Health") is a Florida limited liability company with its principal place of business at 18268 50th Street, Loxahatchee, Florida 33470. According to its Articles of Organization, Lotus Health operates as a "telemedicine doctor referral service."

46.     WILKS is a resident of Greenwell Springs, Louisiana. WILKS owns, operates, and/or controls ACADIAN.

47.     HANLEY is a resident of Prairieville, Louisiana. HANLEY operates and/or controls ACADIAN.

48.     Medicare providers are required to submit an enrollment application to Medicare. The enrollment application contains a certification statement in which the company binds itself to the laws, regulations, and program instructions of Medicare. In addition, providers are required to sign a Section 15 Certification Statement, which includes a certification that:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this supplier. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.

49.     On April 14, 2015, HANLEY signed the Medicare enrollment application and Section 15 Certification Statement on behalf of ACADIAN.

50.     ALLEN[2] is a resident of South Carolina. ALLEN owns, operates, and/or controls Archer, JL Management, and JL Billing. According to Cooperating Witness 1, who is described below, ALLEN is also a part owner of ACADIAN.

---

[2] In August 2019, the government executed a search warrant signed by United States Magistrate Judge Richard L. Bourgeois, Jr., for ALLEN's email account. The allegations in that search warrant overlap with those raised here, specifically as to the payment of kickbacks by ACADIAN and other clinical laboratories in exchange for referrals for cancer genetic testing. *See* Dkt. No. 19-mj-92 (search warrant signed Aug. 9, 2019).

51.    EPSTEIN is a resident of Colorado.    EPSTEIN, along with ALLEN, owns, operates, and/or controls JL Management and JL Billing.    Additionally, with Nolan, EPSTEIN owned, operated, and/or controlled REMN Management and Comprehensive Telcare.

52.    Cooperating Witness 1 ("CW1") is a resident of Madisonville, Louisiana.    Since approximately 2017, CW1 served as the Chief of Operations of Company 1, a Mississippi-based clinical laboratory, and, as of approximately January 2019, CW1 served as the interim Chief Executive Officer of Company 2, a Louisiana-based clinical laboratory.    Prior to 2017, CW1 was an owner and the Chief Operating Officer for Company 3, a Louisiana-based clinical laboratory that CW1 helped found in approximately 2012 or 2013.

## IX.    PROBABLE CAUSE TO BELIEVE THAT A CRIME HAS BEEN COMMITTED
### Summary

53.    I know from my training and experience that certain Medicare providers that conduct genetic testing engage in fraud by pushing genetic testing on Medicare beneficiaries who do not have a medical need for such.    I also know from my training and experience that these Medicare providers often use call centers to market genetic testing kits aggressively to Medicare beneficiaries, without regard to whether the tests are medically necessary.    I also know that these call centers often contract with telemedicine companies that provide doctors to perform "telemedicine" consultations in order to justify the issuance of a doctor's order for these items.    In many cases, these doctors do not actually perform the telemedicine consultation with the beneficiaries, and, in exchange for kickbacks, instead authorize genetic testing without conducting valid examinations of the beneficiaries.

54.    The investigation has revealed that from at least approximately September 2016 to the present, ACADIAN and other clinical laboratories paid ALLEN, EPSTEIN, and others, through entities owned and controlled by ALLEN, EPSTEIN, and others, illegal kickbacks and

bribes in exchange for the referral of DNA samples and test requisitions for cancer genetic testing, as well as in exchange for referrals for other kinds of testing, that was medically unnecessary, not prescribed by a treating physician, and not covered by Medicare. Further, ACADIAN submitted unlawful claims to Medicare, in that ACADIAN sought reimbursement for such medically unnecessary testing and submitted claims procured through the payment of kickbacks and bribes, in violation of representations by HANLEY in Medicare provider applications that ACADIAN would comply with the Federal Anti-Kickback Statute.

55.    These schemes, described below, supply probable cause to believe that crimes have been committed by ACADIAN, specifically the TARGET OFFENSES, and that evidence, fruits, and instrumentalities of these crimes will be found at the SUBJECT PREMISES.

**A.    Illegal Kickback Payments Made in Exchange for Referrals**

56.    CW1, in his/her role as a corporate executive of multiple clinical laboratories located in Louisiana and Mississippi, encountered an unlawful cancer genetic testing conspiracy involving HANLEY, ALLEN, EPSTEIN, and others.

57.    In order to submit claims to Medicare for performing genetic testing, providers generally need: (1) beneficiaries who provide their personal information, insurance information, and DNA samples; and (2) prescriptions issued by physicians or other qualified providers for cancer genetic testing, also known as "requisitions."

58.    According to CW1, ALLEN explained that he and EPSTEIN own durable medical equipment companies that run television and internet advertisements. These advertisements tout the provision of back and knee braces to Medicare beneficiaries at little or no charge. Medicare beneficiaries, lured by this promise, call in to a call center to request the equipment, and are asked to provide their Medicare and other personal information.

59.    CW1 stated that ALLEN and EPSTEIN's call center employees, who are not licensed medical professionals, conclude this call by asking whether the beneficiary has a personal or family history of any type of cancer.  If a beneficiary notes any history of cancer—personal *or* family—the beneficiary is offered a "free" hereditary cancer screening test, and is told that the test will be paid for by Medicare.  If this "free" test is accepted, the beneficiary's contact and Medicare information are then transferred to Lotus Health, a telemedicine company used by ALLEN and EPSTEIN so that cancer genetic testing may be ordered.

60.    According to CW1, ALLEN told him/her that once patient demographic information is gathered by the call center, Lotus Heath providers sometimes contact the Medicare beneficiaries and collect further information needed to order cancer genetic testing, including: (1) whether the beneficiary has or had cancer, the type of cancer, and the diagnosis information; and (2) whether anyone in the beneficiary's family has or had cancer, the type of cancer, and the diagnosis date.  Lotus Health employees enter the corresponding information and diagnosis codes on a requisition.

61.    Once the above information has been gathered, a requisition is mailed to the beneficiary for signature, along with a DNA collection kit containing cotton swabs and a specimen bag, in a pre-addressed, pre-paid package.  Beneficiaries are asked to swab the inside of their cheek, deposit the DNA sample in the specimen bag, sign the requisition, and mail all of the above back to Lotus Health.

62.    ALLEN, through his company Archer, sells completed DNA swabs collected from Medicare beneficiaries along with signed requisitions to various clinical laboratories, including ACADIAN and other laboratories, such as Specialty Drug Testing, LLC ("Specialty Drug"), a clinical laboratory located in Monroe, Louisiana.

63.     In return, the clinical laboratories, including ACADIAN, pay Archer either a fixed rate of payment per sample (in some cases $800 or $1,200 per sample), or a percentage of the Medicare reimbursements paid to the laboratory for each test (in some cases a cut of 50% to 85% of the Medicare reimbursement per test).

64.     These illegal payments, which violate the Federal Anti-Kickback Statute, are disguised in "marketing services contracts" between Archer and the clinical laboratories, including ACADIAN, which were provided to the government by CW1 and are detailed below.

65.     CW1 directly observed this scheme through his interactions, including by email, with ALLEN.  CW1 was interviewed by the government regarding this scheme in recent months.

i.     **ALLEN's Proposed Sale of 70 Requisitions to Company 1 in Exchange for Illegal Kickbacks**

66.     Specifically, CW1 stated that in May or June of 2018, Archer, through ALLEN, offered to sell 70 cancer genetic testing requisitions and DNA samples to Company 1, the clinical laboratory where CW1 worked as the Chief Operating Officer.

67.     ALLEN first suggested to CW1 that in return, Company 1 would pay Archer a fee of 85% of the total amount of net reimbursements for cancer genetic testing paid by Medicare, after subtracting the expense of the tests and a fee for billing to be performed by JL Billing. Company 1 refused.  Then, ALLEN offered that Company 1 would pay Archer a flat rate fee of $800 to $1,200 per sample.  Company 1 again refused.  Finally, ALLEN offered the samples to Company 1 to perform cancer genetic testing on a trial basis, and Company 1 agreed to process the tests (though not to bill Medicare).

68.     As part of the exchange, ALLEN provided requisitions for the 70 tests to Company 1.  After reviewing the requisitions and discussing ALLEN's business practices with ALLEN, Company 1 ultimately refused to submit claims to Medicare for the 70 tests.

69.    As set forth above, Medicare does not reimburse cancer genetic tests based on family history of cancer alone.  According to Company 1's review of the requisition forms ALLEN provided, it appeared that many of the beneficiaries did not have a personal history of cancer.  A representative example of these requisitions, which were provided to the government and reviewed by Affiant, is as follows:

- A "Next Gen Sequencing Requisition" was prepared for beneficiary C.M., who resides in Oklahoma.

- The "Sending Facility" is listed as "Lotus Health."

- The requisition is signed by beneficiary C.M. on July 10, 2018.

- The requisition is then electronically signed by the "Ordering Physician," who in this example resides in Texas, six days later, on July 16, 2018.

- The order for testing has a check next to the box, "Diagnostic (history of cancer or polyps)."  Two ICD-10 codes (a standardized system for coding of medical diagnoses) are listed here.  The two codes relate to family history of cancer and an encounter for genetic testing.

- The "Patient Clinical History," which would include any personal history of cancer, is left blank.

- The "Family History" of cancer is filled out; in this example, it lists an Aunt (Paternal) who was diagnosed with pancreatic cancer at age 60.

- Finally, a "Next-Gen Sequencing Multi-Gene with BRCA1/2" test, a type of multi-gene test panel, is ordered by the physician.  According to the test descriptor, this panel includes genetic testing for 32 different genes, including BRCA1, BRCA2, and others.

70. A snapshot of this representative requisition is below. This example, and many others, show no *personal* history of cancer.



71. In addition, it appeared to CW1 that the providers who signed the requisitions that ALLEN provided to Company 1 had mass-produced and rubber stamped the requisitions. Timestamps on the requisition signatures reviewed by Affiant indicated that physicians tended to batch-sign numerous forms on the same day. Also, the beneficiary signatures generally pre-dated the signatures of the ordering physicians.

72.     Similarly, each requisition appeared to have a generic letter of medical necessity written by the provider.  Other than changing the beneficiary information, the letters typically followed the following template, stating in part:

- "I am writing this letter on behalf of [beneficiary] to support coverage for genetic testing.  I have determined that this test is medically necessary for the above-named patient due to a family and/or personal history of cancer that can lead to susceptibility of cancer based on genetic factors."

- "I have determined that a multi-gene panel is the best course of action for the patient as it offers increased sensitivity compared to testing for a select few genes."

- "The specific personal and/or family history of the patient is included on the laboratory test requisition form."

- "Based on my review of the personal and/or family history . . . I deem this medically necessary."

73.     CW1 provided these 70 requisitions and letters of medical necessity to the government, and Affiant's review of the requisitions and letters confirms the above observations.

74.     Affiant's review of the requisitions and letters of medical necessity further revealed that multiple providers signed the letters and attested to the medical necessity of the requisitions. Timestamps on the requisition signatures reviewed by Affiant indicated that physicians tended to batch-sign numerous forms on the same day.  Upon information and belief, these physicians logged into an electronic portal maintained by Lotus Health to electronically sign requisitions and letters for a list of patients.  These physicians were located in various parts of the country, and would authorize genetic testing for beneficiaries located in different states.  For example, among the 70 requisitions provided to CW1 by ALLEN, Daniel Canchola, M.D., located in Irving, Texas,

electronically ordered genetic testing for beneficiaries located in California, Wisconsin, Wyoming, and elsewhere.

75.    According to CW1, Company 1 performed the lab tests for the 70 samples that ALLEN had provided to Company 1 in May or June of 2018.  However, after reviewing the requisition forms and learning of ALLEN's business practices, Company 1 ultimately refused to submit claims for reimbursement to Medicare for the cancer genetic testing performed on ALLEN's samples.[3]

> **ii.    ALLEN's Proposed Sale of 243 Requisitions to Company 1 in Exchange for Illegal Kickbacks, and Ultimate Sale of Requisitions to ACADIAN and Other Laboratories in Exchange for Illegal Kickbacks**

76.    After sending Company 1 the initial 70 samples, ALLEN asked CW1 if Company 1 would test a second group of 243 samples.  ALLEN sent CW1 the cancer genetic testing requisitions for this second group of Medicare beneficiaries.  According to CW1's review, around 179 requisitions, or approximately 75%, indicated no personal history of cancer.  Affiant's own review of the requisitions, which were provided to the government, confirms this finding. Company 1 declined to test the samples.

77.    According to CW1, in a later telephonic conversation, ALLEN told CW1, "You missed out.  Acadian took those specimens and they will do well off them."  CW1 understood this

---

[3] The government's investigation revealed that Specialty Drug, located in Monroe, submitted claims to Medicare for cancer genetic testing performed on many of the 70 requisitions and samples provided by ALLEN.  CW1 provided to the government a copy of an unsigned contract between Archer and Specialty Drug, whereby Specialty Drug agreed to pay Archer "50% of NET" payments for "CGx tests performed" (i.e., cancer genetic tests) by Specialty Drug each month.  A copy of that contract was sent by a co-owner of Specialty Drug to ALLEN on or about May 31, 2018.  In July and August 2018, EPSTEIN transmitted to ALLEN spreadsheets and invoices for 50% commissions from Specialty Drug's net Medicare reimbursements for cancer genetic tests.  Bank records show that Specialty Drug made payments to Archer consistent with those invoices.

comment to mean that ACADIAN received the samples in exchange for kickback payments, and that ACADIAN processed the tests and submitted claims to Medicare.

78.     CW1 provided to the government an unsigned copy of a "Laboratory Sales Representative Distribution Agreement," dated in one place April 4, 2016, and in another 2018, between Archer and ACADIAN. CW1 recalls that this contract was likely provided to him in hard copy by ALLEN. The contract states that in consideration of Archer's services, Archer will be paid by ACADIAN "50% Net Collections" per "CGX Specimen" (i.e., cancer genetic testing specimen). This compensation agreement—which is found at "Exhibit B" to the unsigned contract—is excerpted below:

| **EXHIBIT B PRECENTAGE FEE SCHEDULE** | |
|---|---|
| 1. Presumptive and Definitive (Screening and Confirmation) Urine/ Saliva drug testing Panel, Infectious Disease, Blood & PGX/CGX | |
| >1 | **50% Net Collections after $550 COG per CGX Specimen**<br>**50% Net Collections after $190 COG per Infectious Diseases Specimen (no overread)**<br>**50% Net Collections after $250 COG per Blood Wellness**<br>**50% Net Collections After $60 COG per Urine (Screening and Confirmation)** |

79.     This draft agreement between Archer and ACADIAN entitles Archer to receive a volume-based commission of 50% of the net reimbursements paid by Medicare for each cancer genetic testing requisition referred to ACADIAN.

80.     A review of bank records for Archer, which were obtained pursuant to grand jury subpoenas, shows that ACADIAN made numerous, substantial payments to Archer. The "originator" information for the wire transfers shows that the payments came from ACADIAN's

checking account based in Baton Rouge, Louisiana. From January 2018 to August 2019, ACADIAN made approximately $10.7 million in payments to Archer.

81. ACADIAN tracked its payments to ALLEN, through Archer. For example, the below spreadsheet was sent by Polly Cox, ACADIAN's Accounting Manager, to ALLEN in February 2019:

| Date | Memo | Amount |
|------|------|--------|
| 11/14/2018 | October 2018 Commissions | -65,187.94 |
| 11/05/2018 | Genetic Commissions | -649,800.00 |
| 10/24/2018 | Genetic Commissions -Invoice #Rep5 | -532,200.00 |
| 10/19/2018 | Commissions | -8,505.00 |
| 10/15/2018 | September 2018 Commission | -72,152.89 |
| 10/11/2018 | Genetic Commissions Invoices #B&M3, Re | -532,917.00 |
| 09/24/2018 | Genetic Commissions | -400,000.00 |
| 09/18/2018 | August 2018 Commissions | -62,793.77 |
| 09/12/2018 | July 2018 Commissions | -46,655.21 |
| 09/12/2018 | August 2018 Genetic Commissions | -376,000.00 |
| 08/16/2018 | July 2018 Commissions | -336,862.27 |
| 07/26/2018 | Commissions | -243,650.00 |
| 07/19/2018 | Genetic Commissions | -200,000.00 |
| 07/17/2018 | June 2018 Commissions | -50,468.45 |
| 07/12/2018 | Genetic Commission | -300,000.00 |
| 06/28/2018 | Commission for June 2018 Genetics | -228,150.00 |
| 06/20/2018 | May 2018 Commissions | -66,805.33 |
| 06/12/2018 | June 2018 Genetics Commissions | -200,000.00 |
| 06/08/2018 | June 2018 Genetics Commission | -50,000.00 |
| 05/30/2018 | May 2018 Genetics Commissions | -100,000.00 |
| 05/15/2018 | April 2018 Commissions | -89,457.03 |
| 04/16/2018 | March 2018 Commissions | -117,659.24 |
| 03/15/2018 | February 2018 Commission | -90,925.21 |
| 02/16/2018 | January 2018 Commission | -84,474.76 |
| 01/16/2018 | December 2017 Commission | -109,402.67 |
| | | -7,340,720.22 |

82. Affiant's review of Medicare claims data confirms that ACADIAN billed Medicare for cancer genetic testing performed on several of the 243 samples referenced above. For example, on August 4, 2018, ACADIAN submitted claims to Medicare for beneficiary J.M. for having performed eleven different types of cancer genetic tests. Beneficiary J.M.'s requisition was provided to CW1 by ALLEN, and subsequently provided to the government by CW1. The requisition does not indicate any personal history of cancer. For beneficiary J.M., ACADIAN billed Medicare $16,870 for performing the genetic tests, and was reimbursed $4,026.91.

83.    Many other requisitions for cancer genetic testing are located in ALLEN's emails. These requisitions are generally of the same format as the requisitions provided by CW1 and described above, and claims for many of these beneficiaries were submitted by ACADIAN to Medicare.

**B.    Additional Evidence of Kickback Payments by ACADIAN**

84.    Additional evidence corroborates statements made by CW1 and demonstrates that ACADIAN made illegal kickback payments to Archer and other entities in exchange for referrals for cancer genetic testing.

85.    In some instances, these payments amounted to 50% of the gross Medicare reimbursement to ACADIAN, as documented in the email exchange between HANLEY and ALLEN below.

---

**RE: CGx**

| | |
|---|---|
| From: | Mark Allen <mallen@mdxdiagnostics.net> |
| To: | Kevin Hanley <kevin@acadianlab.com> |
| Date: | Thu, 26 Apr 2018 16:31:06 +0000 |

Here you go

Gross reimbursement CGx  $4100.00

5% billing     $205.00

COGS     $550.00

Shipping, Swabs, Misc.  $68.00

Adjusted Gross to Lab  $3277.00

At 50% lab keeps   $1638.50

The MS lab has offered a 65% split.  We need to have control of billing the Cgx.

---

86.    In other instances, HANLEY and ALLEN agreed that Archer (through ALLEN) would be reimbursed a flat rate per referral.  For example, the below email shows a discussion of ACADIAN paying "$1000 per test" to ALLEN.



**Re: CGX**

From:     Mark Allen <mallen@mdxdiagnostics.net>
To:       Kevin Hanley <kevin@acadianlab.com>
Date:     Wed, 25 Apr 2018 16:08:39 +0000

We need $1000 per test today to keep the wheels on, I think the total is $88K. We'll pay 100% of those funds out to reps, we'll make our portion on the re-billed codes and the remainder collected.

Call me if you have any questions.

On Apr 25, 2018, at 12:00 PM, Kevin Hanley <Kevin@acadianlab.com> wrote:

**CGX**

| | | | |
|---|---|---|---|
| Test | 2648 | 100% Adjudication | 4100 |
| Otto | 250 | | 250 |
| Swab | 28 | | 28 |
| payment | 1000 | | 1000 |
| ship/misc | 20 | | 20 |
| Billing | 132.4 | | 205 |
| Lab | 1217.6 | | 2597 |
| Archer? | | | |

**Kevin Hanley**
**CFO**

<118042511595001037.png>

**Acadian Laboratories - Baton Rouge, LA**
(T) 225-448-5886 x1169
(F)
(C) 901-336-5602

87.     Based on Affiant's review of emails and other documents, HANLEY and ALLEN often used a payment structure of $1,000 per referral, plus 50% of the adjusted Medicare reimbursement (the Medicare reimbursement minus a 5% billing fee and cost of goods sold). This formula is reflected in several spreadsheets and invoices circulated among HANLEY, ALLEN, and EPSTEIN.

88.     For example, on October 3, 2018, Archer, through EPSTEIN, sent an invoice to ACADIAN for "Sept Genetics," for a total of $147,612. Of this amount, $71,000 was broken out as payment for referrals (identified as "Rep", i.e., payments to sales rep Archer), and $76,612 was identified as a commission payment.

89.     Consistent with the formula identified above, this invoice sought payment from ACADIAN for referral of 71 samples by Archer to ACADIAN for genetic testing (at $1,000 per referral), plus 50% of the adjusted Medicare reimbursement for such testing.  On October 11, 2018, ACADIAN wired a payment of $147,612 to Archer.

90.     In April 2019, ALLEN emailed HANLEY a breakdown of cancer genetic testing payments to ACADIAN for the years 2018 and 2019.  The spreadsheet, excerpted below, showed that ACADIAN brought in over $21 million in revenue for performing cancer genetic testing.  Of this amount, over $9 million was paid by ACADIAN to Archer and JL billing, entities owned by ALLEN.

| Acadian Diagnostic Laboratories LLC | | | | |
|---|---|---|---|---|
| Genetic Payments through 02/22/19 | | | Total Payments | |
| | 12/31/2018 | 01/31/2019 | | |
| | | | | |
| Archer Diagnostics | 6,422,828.27 | 1,600,000.00 | 8,422,828.27 | |
| JL Billing | 600,000.00 | - | 600,000.00 | |
| Kailos Genetics | 335,014.00 | 325.00 | 335,339.00 | |
| OTO Genetics | 2,124,050.00 | 454,000.00 | 2,739,352.36 | |
| Chris McCaskill - Consulting | 90,000.00 | 15,000.00 | 105,000.00 | |
| Phoenix Laboratory Consulting | 10,000.00 | - | 10,000.00 | |
| Genetic Counseling | 5,000.00 | 8,000.00 | 13,000.00 | |
| Lab Director | 24,000.00 | 4,000.00 | 28,000.00 | |
| | | | | |
| | 9,610,892.27 | 2,081,325.00 | 12,253,519.63 | 58% |
| | | | | |
| Gross Revenue - 1/1/18 - 01/31/19 | | | 21,168,445.74 | |
| | | | | |
| | | | 8,914,926.11 | 42% |
| | | | | |
| | | 800 additional | 13,053,519.63 | 62% |
| | | | 8,114,926.11 | 38% |

91.     Additional evidence also demonstrates that ACADIAN paid illegal kickbacks in exchange for referrals for other kinds of testing, such as urine drug testing, dating back to at least 2016.

26

92.    The Investigative Team interviewed former sales representatives of ACADIAN, and reviewed emails containing tracking logs and commission reports pertaining to referrals brought to ACADIAN by sales representatives.

93.    This evidence shows that ACADIAN contracted with sales representatives and marketing companies for the referral of urine samples for toxicology testing, and that payment was made on a "per sample" basis or by a percentage of federal payor reimbursement.  Additionally, the evidence shows that ACADIAN paid physicians to induce these referrals, in violation of the Federal Anti-Kickback Statute.

94.    ACADIAN kept detailed commission logs and reports tracking the performance of its sales representatives.  Often, ACADIAN's Accounting Manager, Polly Cox, sent these reports to marketers, such as ALLEN, and to managers of ACADIAN, including HANLEY.

95.    G0481 and G0483 are HCPCS codes pertaining to urine drug testing, specifically quantitative testing.  Below is an example of an ACADIAN spreadsheet that tracked referrals for urine drug testing, billed under HCPCS codes G0481 and G0483 by sales representatives, including ALLEN and his business associate Chris Hefner.  Some of this testing was billed to federal payors, including Medicare and TRICARE.

| | A | B | C | D | E | F | G | H | | I | | J | K |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Sub Rep | Sales Rep | Referring Provider | Payer Name | Patient Name | Date of | Procedure | Insurance | | Gross Applied | | location | |
| 2 | Chris Hefner | Mark Allen | AKMAL, NAYEEM | Tricare for Life (All Regions 1-12) * | | 08/08/2018 | G0483 | $ | 245.93 | $ | 245.93 | ADL | |
| 3 | Chris Hefner | Mark Allen | AKMAL, NAYEEM | CIGNA | | 09/10/2018 | G0481 | $ | - | $ | - | ADL | |
| 4 | Chris Hefner | Mark Allen | AKMAL, NAYEEM | CIGNA | | 09/05/2018 | G0481 | $ | - | $ | - | ADL | |
| 5 | Chris Hefner | Mark Allen | AKMAL, NAYEEM | TriEAST | | 08/20/2018 | G0483 | $ | 245.93 | $ | 245.93 | ADL | |
| 6 | Chris Hefner | Mark Allen | AKMAL, NAYEEM | Medicare Part B Louisiana * | | 08/03/2018 | G0483 | $ | 241.98 | $ | 241.98 | ADL | |
| 7 | Chris Hefner | Mark Allen | AKMAL, NAYEEM | Medicare Part B Louisiana * | | 08/13/2018 | G0483 | $ | - | $ | - | ADL | |
| 8 | Chris Hefner | Mark Allen | AKMAL, NAYEEM | Humana | | 08/21/2018 | G0483 | $ | - | $ | - | ADL | |
| 9 | Chris Hefner | Mark Allen | AKMAL, NAYEEM | Medicare Part B Louisiana * | | 08/21/2018 | G0483 | $ | - | $ | - | ADL | |
| 10 | Chris Hefner | Mark Allen | AKMAL, NAYEEM | Medicare Part B Louisiana * | | 08/27/2018 | G0483 | $ | 241.98 | $ | 241.98 | ADL | |
| 11 | Chris Hefner | Mark Allen | AKMAL, NAYEEM | Medicare Part B Louisiana * | | 08/23/2018 | G0483 | $ | 241.98 | $ | 241.98 | ADL | |
| 12 | Chris Hefner | Mark Allen | AKMAL, NAYEEM | Medicare Part B Louisiana * | | 08/27/2018 | G0483 | $ | 241.98 | $ | 241.98 | ADL | |
| 13 | Chris Hefner | Mark Allen | AKMAL, NAYEEM | SELF PAY | | 09/12/2018 | G0483 | $ | - | $ | - | ADL | |

96.    A review of ACADIAN's bank records shows millions of dollars being paid to various sales representatives, dating back to 2016, when ACADIAN's business focused primarily

on urine drug testing.[4]  For example, ACADIAN paid sales representative Billy Baker over $2.6 million from August 2016 to June 2019.  On February 5, 2018, Baker emailed ALLEN, stating that he had talked to "Kevin" and has "CGX I want to talk to you about and see if you want to still do the Medicare."

97.    Leslie McHugh ("MCHUGH"), a nurse, worked as a "marketing specialist" for ACADIAN beginning in approximately December 2015.  According to wage records, ACADIAN paid MCHUGH over $495,000 during the course of her employment.[5]

98.    In October 2018, Affiant interviewed Cooperating Witness 2 ("CW2"), a nurse and former ACADIAN sales representative who worked with MCHUGH in Florida.  CW2 stated that in 2016, s/he witnessed MCHUGH paying cash to a physician in exchange for referrals of urine specimens for toxicology testing.  According to CW2, s/he told WILKS about these unlawful payments, but MCHUGH continued to be employed by ACADIAN.

99.    ACADIAN's payments to Archer, and other entities owned or controlled by ALLEN and EPSTEIN, date back earlier than 2018.  For example, on September 15, 2016, ACADIAN wired a payment from its account in Baton Rouge, Louisiana to Archer, in the amount

---

[4] A report from a CLIA onsite audit of the SUBJECT PREMISES dated November 3, 2017, states that ACADIAN performed two million urine drug confirmation tests annually.

[5] In December 2016, MCHUGH was excluded from participating in Medicare following a conviction related to misuse of patients' credit card information.  MCHUGH's exclusion letter from HHS-OIG stated, "You are excluded from participation in any capacity in the Medicare, Medicaid, and **all** Federal health care programs . . . .  Any excluded person cannot be employed by a provider to perform functions paid for, in whole or in part, by any Federal health care program."  MCHUGH was reinstated in April 2018.  During much of the time period of her exclusion, MCHUGH continued to work for ACADIAN.  Even after ACADIAN terminated her in August 2017, WILKS and HANLEY continued to make payments to her.  In September 2017, WILKS and HANLEY established an entity named "Onsite Healthcare Group, LLC" with the Louisiana Secretary of State.  Through this entity, WILKS and HANLEY made payments to MCHUGH until she was reinstated by Medicare in April 2018.  The next month, payments to MCHUGH through ACADIAN resumed.

of $29,252.08, and on the same date, wired a payment to MDX Diagnostics, LLC, a South Carolina company known to be owned by ALLEN, in the amount of $207,351.72.

### C.    Fraudulent Billing for Cancer Genetic Testing

100.    Additional evidence shows that ACADIAN billed Medicare for millions of dollars in medically unnecessary genetic testing, which was not appropriately reimbursed by Medicare.

101.    As described by CW1, based on his conversations with ALLEN, ALLEN and EPSTEIN, operating through Archer, REMN, and other companies, obtained cancer genetic test orders through others.    ALLEN had a network of "distributors" (i.e., recruiters) and sales representatives who solicited patients through call centers that used telemarketing, internet advertisements, direct contact at community health events and senior centers, and other mass outreach methods, searching for individuals with only a family history of cancer to justify the tests. For example, in emails to ALLEN from Chris Hefner, the President of Blue Sky Medical, who described himself as ALLEN's "partner," other recruiters were offered payments for bringing in cancer genetic testing samples that could be billed through ACADIAN.

102.    In order for ACADIAN to submit claims to Medicare, it was necessary to have a physician attest to the medical necessity of each test on the requisition form.    ALLEN and EPSTEIN, with HANLEY's knowledge, arranged to have telemedicine doctors, some of whom were associated with EPSTEIN's company Comprehensive Telcare, "prescribe" the tests before transmitting the requisitions to ACADIAN.

103.    The doctors had minimal, if any, contact with the patients, and did not order the tests or use the results in the course of actual medical treatment.    Doctors typically signed generic letters of medical necessity stating that the patients would benefit from cancer genetic testing, and

frequently approved the tests *after* the patients had consented to testing and provided a sample—an indication that the test was not part of true medical treatment.

### i.    Use of Telemedicine Doctors to Obtain Genetic Testing Orders

104.    ALLEN and EPSTEIN arranged for telemedicine physicians and other medical professionals to authorize cancer genetic orders.  Providers would log in to an electronic portal maintained by Comprehensive Telcare or Lotus Health and electronically sign requisitions and letters of medical necessity for beneficiaries who had already consented to testing.  These physicians were located in various parts of the country, and would authorize genetic testing for beneficiaries located in different states.

105.    For example, one of the physicians who signed requisitions provided to the government is Daniel Canchola, M.D.  Canchola is a Texas-based physician who provided telemedicine approvals of cancer genetic tests billed by ACADIAN, through his work for Comprehensive Telcare.  In a recent interview, Canchola admitted that he spent two to three minutes on each requisition, that he did not speak to the patients, and that he did not serve as the patients' treating physician.  ACADIAN submitted over $46 million in claims to Medicare for cancer genetic testing referred by Canchola, and was reimbursed over $8.6 million.

106.    In February and March 2019, in another investigation, agents interviewed three physicians who authorized genetic testing through Lotus Health.  According to these physicians, they logged into a Lotus Health portal, where there would be a list of patient names for whom the doctors were to perform a consultation to authorize genetic testing.  The portal provided basic beneficiary information to the physicians.  Two of the physicians hired through Lotus Health reported that they never contacted the beneficiaries after the genetic testing was completed to go over the results with the beneficiary.  The third physician stated that s/he contacted only 25-30%

of the beneficiaries to go over the results. The physicians stated that Lotus Health informed them that the results would be sent to the beneficiary's primary care physician, who would discuss the results. The Lotus Health physicians did not explain why beneficiaries with a primary care physician would need a telemedicine doctor to order the genetic testing, rather than having the primary care physician order the testing. None of the Lotus Health physicians had specific training in genetics or genetic testing.

107. The beneficiary signatures on the hundreds of requisitions provided to the government by CW1, as well as other requisitions the government obtained from ALLEN's email account and from a Medicare contractor audit of Specialty Drug, usually pre-date the signature of the ordering physician, meaning that testing was ordered after a testing kit was shipped to and completed by the beneficiary. However, the normal course of medical practice would be for a provider's authorization for a test to be the first step in a beneficiary receiving a test.

108. Based on Affiant's review, several characteristics of the requisitions sent to ACADIAN reveal that the testing lacked medical necessity.

    a.    The patient's signature and/or the collection date for the sample usually predates—sometimes by several weeks—the signature of the doctor. The timing difference is an indication that the doctors had only been brought in after the fact to approve tests that a patient agreed to take, and were not actually treating the patients.

    b.    Testing for a comprehensive panel is indicated in nearly every case, regardless of what type of cancer the patient reports having had personally or among family members, even though the requisitions contain the option to test for the more limited panels.

    c.     The requisitions are accompanied by generic letters of medical necessity. These letters recite that genetic testing is necessary due to the "personal and/or family" history of cancer listed by the patient, and state that the results "are needed in order to consider various medical management strategies for the patient."

    d.     Most of the requisitions were signed by a small number of doctors, and the timestamps on the requisitions shows that the doctors signed requisitions within minutes of one another.

109.    A telemedicine doctor who never sees a beneficiary, never treats a beneficiary before or after a genetic test, and never uses the results of genetic testing in the management of a beneficiary's specific medical problem is not a "treating physician."   42 C.F.R. § 410.32(a). Genetic tests billed to Medicare based on requisitions from such telemedicine doctors are not properly reimbursable.

### ii.    CW1's Recorded Calls

110.    On June 29, 2019, CW1 placed a recorded call to ALLEN.  Among other things, ALLEN discussed a health care fraud "opinion letter" that came out in approximately May 2018 regarding Medicare reimbursement of cancer genetic testing.  ALLEN said the letter was "scary as hell," because it says "that you have to have an existing relationship with that patient, an ongoing relationship, you have to have treatment of that patient, and if not, it's considered not testing, but screening; Medicare doesn't pay for screening."

111.    On July 9, 2019, CW1 placed another recorded call to ALLEN.  Among other things, ALLEN again discussed the "opinion letter," and said he is "terrified."  ALLEN said he has "stopped" using telemedicine companies to obtain requisitions for cancer genetic testing.  He

mentioned that he had "turned up" some new business that does not involve use of telemedicine to obtain requisitions; instead, physicians perform a "face-to-face patient encounter," which ALLEN called "the real deal." ALLEN acknowledged that he done "a lot—like a lot" of business using telemedicine in the past.

112.    On August 22, 2019, CW1 recorded a meeting he had with HANLEY. Among other things, HANLEY demonstrated knowledge of the Federal Anti-Kickback Statute, stating, "You're not supposed to pay a dollar on a federal sample. Any way you look at it."

113.    On September 18, 2019, CW1 recorded a meeting with WILKS. Among other things, WILKS indicated that at one point in time he was close to ALLEN, but had a falling out after ALLEN started working with EPSTEIN. WILKS stated, "This whole telemedicine crap is technically Rick Epstein's brainchild. . . . All these people getting in trouble, 95% of it came from Epstein."

### iii.    Referrals to ACADIAN from Telemedicine Providers

114.    From January 1, 2016 through August 20, 2019, Acadian submitted approximately $132,739,786.48 in claims and was reimbursed approximately $21,819,580.05 for cancer genetic testing.

115.    The Investigative Team has determined that at least $84 million in claims submitted by ACADIAN to Medicare for cancer genetic testing are based on referrals from physicians who worked for various purported telemedicine companies, and who have no doctor-patient relationship with the beneficiaries.

116.    On April 10, 2019, HANLEY emailed ALLEN a list of "teledocs" relied upon to refer samples for genetic testing. The attached excel spreadsheet listed 88 physicians, the majority

of whom were listed as working for Lotus Health. The remaining physicians were listed as working for telemedicine company "Provider Partner."

117.    The majority of ACADIAN's claims to Medicare for cancer genetic testing are for testing performed on samples referred by physicians who provided services for Lotus Health, Provider Partner, and Comprehensive Telcare. Lotus Health is also referred to by ALLEN and EPSTEIN as Comprehensive Telcare; the two companies share the same ownership and business model.

118.    The below table shows the amount submitted by ACADIAN to Medicare for cancer genetic testing referred by providers associated with these purported telemedicine companies.

| Company | Amount Billed | Amount Paid |
|---|---|---|
| Lotus Health | $20,737,383.50 | $2,207,672.65 |
| Provider Partner | $2,537,631.45 | $222,538.89 |
| Comprehensive Telcare | $61,625,775.50 | $11,345,942.18 |
| **Total** | **$84,900,790.45** | **$13,776,153.72** |

### iv.    Interviews of Referring Physicians

119.    Investigators have interviewed physicians who provided services for these and other telemedicine companies.

120.    On August 20, 2019, agents interviewed Daniel Canchola, M.D. Between January 1, 2016 and August 20, 2019, ACADIAN submitted $46,605,703 in claims to Medicare and was reimbursed $8,673,041.64 for cancer genetic testing referred by Canchola.

121.    Canchola told investigators that he did business with EPSTEIN through Comprehensive Telcare and REMN. He explained that he would receive emails to his Yahoo! account from Comprehensive Telcare, which contained attachments using the software application

DocuSign.  The attachment contained either a requisition for durable medical equipment or for cancer genetic testing.  Each order was prefilled and only needed to be signed by Canchola.  Canchola estimated that he would spend 2-3 minutes on each order, and then would click to affix his electronic signature.  He would be paid $20-$30 for each order he signed.

122.    Canchola never saw any test results.  He ordered cancer genetic testing for patients living across the country.  He never spoke to, met, or "swabbed" any patients.  He admitted that he was not the patients' treating physician and that he did not have any sort of doctor-patient relationship with them.

123.    In one particularly egregious example, ACADIAN submitted a claim to Medicare for cancer genetic testing performed on beneficiary L.G. based on a referral by Canchola.  Canchola ordered the test on October 12, 2018, and ACADIAN submitted a claim to Medicare for testing on the same day.  However, on September 25, 2018, L.G. passed away—two weeks before testing was ordered by Canchola, and purportedly performed by ACADIAN.

124.    Investigators also interviewed Cooperating Witness 3 ("CW3"), a nurse practitioner who practices in Georgia.  CW3 worked with REMN Management, which s/he also knew as Comprehensive Telcare.  Initially, CW3 only made referrals for durable medical equipment.  At some point, EPSTEIN told CW3 that he was adding cancer genetic testing for patients with family history of cancer.  CW3 had no special training in cancer genetic testing and did not know the circumstances in which Medicare covered the testing.  EPSTEIN told CW3 at the outset that CW3 would see some orders that had already been tested by the lab, and were being sent for medical review afterward because of paperwork delays.

125.    CW3 was told by email when requisitions were ready for review, and s/he would access them through DocuSign, an online platform. When CW3 opened the requisitions, they

would already be pre-filled with the test to be performed, the diagnosis codes, and the patient's signature.  CW3 would determine if the patient had a family history of cancer, and if they did, CW3 approved.  CW3 was given a standard letter of medical necessity, which s/he also signed. Lack of family history was the only circumstance in which he would reject an order.  CW3 spoke to a few patients in the beginning, but then stopped doing so.  S/he never received test results.

126.    ACADIAN submitted $4.7 million in claims to Medicare for cancer genetic testing with CW3 as the referring provider, with dates of service between May 2018 and January 2019.

127.    A data analysis shows that for approximately 75% of ACADIAN's billed beneficiaries, the referring providers did not separately bill for office visits conducted with the beneficiaries.  This data demonstrates that the physicians who approved the orders sent to ACADIAN had no ongoing relationship with the beneficiaries, and did not meet with or speak to them.

### v.     Patient Complaints

128.    ACADIAN received numerous complaints from beneficiaries that tests were ordered by persons other than their treating physicians, that they never received their test results, and that they received explanations of benefits ("EOBs") showing that Medicare was billed thousands of dollars for unnecessary tests.

129.    For example, based on emails reviewed by Affiant and interviews of beneficiaries, many beneficiaries received EOBs showing that ACADIAN had billed Medicare for expensive genetic testing.  The beneficiaries then called to inform ACADIAN that they either did not receive the claimed services or any testing results, and/or that they did not know and had never heard of the ordering physician.

130.    These complaints demonstrate that the tests performed by ACADIAN and billed to Medicare were not ordered by beneficiaries' treating physicians and were not used in the management of beneficiaries' specific medical problems.[6]

131.    Amy Hinson ("Hinson"), HANLEY's secretary, informed HANLEY in emails that she receives "several calls daily" from beneficiaries.  Hinson repeatedly informed HANLEY, ALLEN, and others that patients called to complain about receiving a bill for services rendered by ACADIAN but not receiving any results.

132.    One such email from Hinson to HANLEY stated, "Kevin, I receive several calls a week about these same issues.  I have sent them to Mark Allen and assume they are getting called back."  HANLEY forwarded the email to ALLEN with a note saying, "This is going to cause big problems," and ALLEN forwarded it to EPSTEIN.  These emails provide evidence that HANLEY, ALLEN, and EPSTEIN knew that test results were not being transmitted to the ordering physicians for use in the treatment of the patients.

133.    Examples of these beneficiary complaints follow.

> **From:** Amy Hinson <AHinson@acadianlab.com>
> **Date:** December 4, 2018 at 1:31:32 PM EST
> **To:** Kevin Hanley <Kevin@acadianlab.com>
> **Subject:** Lotus Genetics
>
> Kevin,
>
> I continue to receive several calls daily about Lotus Genetic test results.  The process in place to contact the patients is not working.  Most of the patients getting tested are older to elderly.  They receive an EOB from Medicare and automatically assume its Medicare fraud due to the amount charged and because they have not received their results (phone call, email or regular mail).  When I receive the calls, I send the information to Mark Allen and cc you.  This is where the process has been failing.  A lot of the patients are still not getting contacted.  They then call back irate and threating to call the authorities for Medicare fraud.  Prime example below...
>
> Diana Tucker works for the City of Mauldin, NC.  Several senior citizens were swabbed in May.  The first time I spoke to Diana was in October.  Before she contacted us, she reached out to Rick Epstein but didn't get a callback.  She still has not received a call or email from anyone.  She continues to receive several complaints from the seniors that have not been contacted.  She called today and said they are about to follow a formal complaint on Acadian with Medicare for fraud.

---

[6] ALLEN had knowledge of the Medicare requirements that cancer genetic testing be ordered by a treating physician and only for beneficiaries with a personal history of cancer, as evidenced by a December 2018 email he sent that attached a Medicare Learning Network article discussing NCD 90.2.

**From:** Amy Hinson <AHinson@acadianlab.com>
**Date:** October 15, 2018 at 9:32:25 AM CDT
**To:** Mark Allen <MAllen@mdxdiagnostics.net>
**Cc:** Kevin Hanley <Kevin@acadianlab.com>
**Subject: Results**

████████████ called for her screen results from May 30, 2018.  She was tested at the Ray Hopkins Senior Center in Georgia.  She would like a return call today.

████████Lotus account

████████

████████

Amy Hinson

Acadian Diagnostic Laboratories

11842 Justice Ave

Baton Rouge, LA 70816

225.448.5886 office

225.292.5956 fax

## another Patient upset

**From:**    Terry Connor <terryc@acadianlab.com>
**To:**        Mark Allen <mallen@mdxdiagnostics.net>
**Cc:**        Kevin Hanley <kevin@acadianlab.com>
**Date:**     Tue, 02 Apr 2019 16:46:55 +0000

She is NOT contacting Medicare but she is a bit upset.

1. Who ever she talked to on the phone told her that this was "FREE:". She is very articulate and knowledgeable about billing (she did this for years in a hospital). She said it was free to me but not to someone (Medicare).
2. She also doesn't understand the report.
3. Can someone please call her- from your Counseling team. That's all wants to talk to.

Do NOT pull money back from Medicare.

Please let m know when the above is done so I can complete my report to Kevin (required for patient complaints).

Thank You Mark

**From:** Heather Wyatt <HWyatt@acadianlab.com>
**Date:** March 15, 2019 at 2:00:40 PM CDT
**To:** Kevin Hanley <Kevin@acadianlab.com>
**Subject: Missing Genetic Specimen - Lotus**

**Kevin Hanley**
**CFO**



ACADIAN Diagnostic
Laboratories LLC

**Acadian Laboratories - Baton Rouge, LA**
(T) 225-448-5886 x1169
(F)
(C) 901-336-5602

>

Kevin-

A gentleman called in today because he and his wife had swabs done at the same time through Lotus. She received her results, but we never received his swab to run the testing. He is concerned due to billing on the insurance side and also because he has been reading about a scam being run with this type of testing. I was unsure as to what I should/shouldn't say, so I'm forwarding his number so that he might be able to get some idea of why he didn't receive his results, etc.

### vi.    Beneficiary Interviews

134.    In 2019, the Investigative Team interviewed several Medicare beneficiaries for whom ACADIAN submitted claims to Medicare. Overwhelmingly, the patients did not know the ordering physicians and in most cases never received any test results.

135.    <u>B.B.</u>:  B.B. receives a lot of calls about genetic testing. He provided a genetic sample but never received the results. ACADIAN billed Medicare $16,780 and was paid $4,026.91 for cancer genetic testing performed for B.B. He does not recall whether he has seen or heard of referring physician Jennifer Williams.

136.    <u>M.B.</u>:  ACADIAN billed Medicare $19,768 and was paid $2,648.83 for cancer genetic testing performed for Medicare beneficiary M.B. C.B., the daughter of M.B. who handles all of M.B.'s affairs, has not heard of referring physician Smita Prasad.

137.    E.D.: E.D. received a genetic swab packet in the mail, provided a sample, and sent it back. He never received the test results. ACADIAN billed Medicare $4,616 and was paid $861.68 for cancer genetic testing performed for E.D. E.D. does not know referring physician J. Chapman. He does not have a history of cancer.

138.    G.P.: G.P. received calls regarding offers for genetic testing. During the calls, G.P. did not speak with a physician. In approximately April 2018, G.P. received a genetic testing kit in the mail. G.P. used the swabs and submitted the completed kit back to the company. She received results in the mail. ACADIAN billed Medicare $14,920 and was paid $2,648.83 for cancer genetic testing performed for G.P. She has never heard of and is not a patient of referring physician Smita Prasad.

139.    J.R.: J.R. received several calls asking him if he wanted free cancer screenings. He received a genetic testing kit, completed it, and mailed it out. J.R. never received any results. ACADIAN billed Medicare $19,768 and was paid $2,648.83 for cancer genetic testing performed for J.R. J.R. does not know referring physician Jennifer Williams and has never seen her as a patient. Despite the requisition stating that J.R. has a family history of malignant neoplasm of breast, J.R. does not have a family history of breast cancer.

140.    M.G.: M.G. received calls offering free orthotic braces. She has never received a genetic testing kit or testing results in the mail. ACADIAN billed Medicare $16,780 and was paid $4,026.91 for cancer genetic testing performed for Gauthier. She has never heard of and is not a patient of referring physician Jennifer Williams.

141.    M.P.: M.P. never received a genetic testing kit or completed a genetic testing kit to the best of his knowledge. ACADIAN billed Medicare $4,616 and was paid $861.68 for cancer

genetic testing performed for M.P.  M.P. has never heard of, spoken to, or seen referring physician J. Chapman.

142.    P.P.: P.P. made a complaint to Medicare for services not received by ACADIAN, after receiving a letter from Novitas.  She does not believe that she ever completed a genetic testing swab or received any results for this alleged testing.  ACADIAN billed Medicare $12,580 and was paid $2,648.83 for cancer genetic testing performed for P.P.  She has never seen referring physician Jude Germaine.

143.    W.M.: W.M. received calls regarding offers for genetic testing.  In approximately April 2018, she received two genetic testing kits in the mail.  She completed two swabs and received test results.  ACADIAN billed Medicare $22,108 and was paid $764.40 for cancer genetic testing for W.M.  She has never heard of and is not a patient of referring physicians Smita Prasad or Patricia Powell.

144.    In addition to the above, in 2019, investigators interviewed three beneficiaries who made complaints directly to ACADIAN.  All three did not know the physicians who ordered the tests.

145.    E.D.: ACADIAN billed Medicare $19,768 and was paid $4,996.75 for cancer genetic testing performed for Medicare beneficiary E.D.  E.D. does not know referring physician Daniel Canchola.  She remembers being swabbed in a senior center.  Despite complaining directly to ACADIAN, she still has not received any results.  She feels she was scammed.

146.    T.D.: T.D. received a phone call about free cancer screening.  He received a genetic testing kit in the mail, completed the swab, and mailed it off.  T.D. never heard anything back until he received an EOB.  He called ACADIAN numerous times and finally received his results.  ACADIAN billed Medicare $19,768 and was paid $2,648.83 for cancer genetic testing performed

for T.D.  T.D. has never seen or heard of referring physician Vijil Rahulan.  T.D. has a family history of cancer but no personal history of cancer.

147.    C.P.: ACADIAN billed Medicare $23,968 and was paid $6,374.83 for cancer genetic testing performed for Medicare beneficiary C.P.  His daughter and care-taker, A.P., complained to ACADIAN.  She is not familiar with ordering physician Kateline Lavache.  Her father is in an assisted living facility and no one at the facility is aware of Lavache or ACADIAN.  C.P. and A.P. never received any results.

148.    The above interviews and other evidence show that ACADIAN submitted claims to Medicare for medically unnecessary cancer genetic tests, as, among other things, the tests were not ordered by the beneficiaries' treating physicians and were not used in patient treatment.

## X.    PROBABLE CAUSE TO SEARCH THE SUBJECT PREMISES

149.    There is probable cause to believe that ACADIAN committed the TARGET OFFENSES, and the evidence, fruits, and instrumentalities of these crimes will be found at the SUBJECT PREMISES.

150.    ACADIAN has operated at the SUBJECT PREMISES from in or around August 2012 to present.

151.    Physical surveillance as recent as September 18, 2019 revealed that ACADIAN continues to operate at the SUBJECT PREMISES.

### i.    11842 Justice Avenue, Baton Rouge, Louisiana 70816

152.    According to the National Provider Information Registry, maintained by HHS, ACADIAN's premises at 11842 Justice Avenue, Baton Rouge, Louisiana 70816 is listed as its primary practice address.

153.    On October 19, 2015, AdvanceMed, the former Medicare Zone Program Integrity Contractor for Louisiana, conducted a site visit of ACADIAN's premises at 11842 Justice Avenue, Baton Rouge, Louisiana 70816.    In November 2018 and September 2019, Affiant spoke to AdvanceMed employees Barbara Alleman and Wendy Naquin regarding the site visit.    Affiant learned that during the site visit, AdvanceMed interviewed employees of ACADIAN, including WILKS and HANLEY, at this location.    Also, AdvanceMed conducted a tour of the facility, and observed ACADIAN's laboratory testing instruments.    AdvanceMed was also given a copy of a blank requisition form.    Based on the interviews and observations made during the site visit, it is believed that ACADIAN's laboratory equipment, requisitions, and testing results will be found at 11842 Justice Avenue, Baton Rouge, Louisiana 70816.

154.    Additionally, on October 30, 2017 through November 3, 2017, and October 23, 2018 through October 25, 2018, the Louisiana Department of Health ("LDH") conducted site visits of ACADIAN's premises at 11842 Justice Avenue, Baton Rouge, Louisiana 70816.    Auditors observed ACADIAN's laboratory testing equipment, operational manuals, specimens for testing, and test results, among other items, at this location.    Additionally, on November 30, 2017, auditors interviewed a person at this location who identified himself as the "CEO of the laboratory."

155.    ACADIAN's genetic testing results obtained and reviewed by Affiant list ACADIAN's premises at 11842 Justice Avenue, Baton Rouge, Louisiana 70816.

156.    On September 18, 2019, the Investigative Team conducted surveillance of 11842 Justice Avenue, and observed persons believed to be ACADIAN's Laboratory Assistant and Office Manager, based on observation of licenses plates, entering the premises.    Investigators also observed an employee in scrubs exit the premises with a basket, and then minutes later, deliver the basket to 11606 Southfork Avenue, Suite 500.

ii.        **11606 Southfork Avenue, Suites 102, 103, and 104**

157.    There is probable cause to believe that ACADIAN's accounting, employee, and human resource records will be found at 11606 Southfork Avenue, Suites 102, 103, and 104, Baton Rouge, Louisiana 70816.  These suites are located in "Building A," which is comprised of Suites 100 through 104.  Suites 100 and 101 appear to be businesses not related to ACADIAN or its owners and operators.

158.    Affiant and other investigators visited Building A on multiple occasions.  Most recently, on September 18, 2019, the Investigative Team observed a sign stating, "Accounting and Human Resources" located directly outside of the door to Suite 102.  The sign includes a logo for "Acadian Diagnostic Laboratories, LLC," as well as other businesses.

159.    Other entities listed on the sign include Delta Subsidiaries, Inc.  The officers of Delta Subsidiaries, Inc. are WILKS and HANLEY, and the principal place of business is 11842 Justice Avenue, Baton Rouge, Louisiana 70816.  Delta shares the same tax identification number as ACADIAN.  Other businesses listed are Cottonmouth Boats, LLC, ADL Consultant Group, LLC, Run to Wellness, LLC, Cypress Garden Investments, LLC, and Hybrid Toxicology, LLC.  The officers of these businesses are either HANLEY or both WILKS and HANLEY.  Run to Wellness, LLC and Hybrid Toxicology, LLC are no longer in good standing with the Louisiana Secretary of State for failing to file an annual report.

160.    Suite 102 is also the principal place of business of Onsite Healthcare Group, LLC ("Onsite").  The officers of Onsite are WILKS and HANLEY.  As discussed above in footnote 5, in September 2017, WILKS and HANLEY established "Onsite Healthcare Group, LLC" with the Louisiana Secretary of State.  Through this entity, WILKS and HANLEY made payments to

MCHUGH until she was reinstated by Medicare in April 2018. The next month, payments to MCHUGH through ACADIAN resumed.

161.    On September 10, 2019, Affiant witnessed individuals believed to be ACADIAN's Accounting Manager, Polly Cox, and Human Resources Administrator, Bridget Ringe, enter Suite 102. Affiant observed these individuals exit vehicles with license plates belonging to Cox and Ringe. Investigators also witnessed individuals believed to be Heather Wyatt, ACADIAN's Sales Support Associate, and Jason Campagna, Acadian's Clinical Laboratory Scientist, enter Suite 104, based on observation of license plates.

162.    Based on Affiant's review of emails and other documents, ACADIAN routinely tracked referrals from physicians and sales representatives with logs and reports. These reports were prepared by Polly Cox, who often sent the reports to HANLEY and ALLEN. Based on Affiant's observation of an individual believed to be Polly Cox enter Suite 102, it is believed that such reports, as well as billing information, will be found in Suite 102.

163.    As for Suite 103, a sign posted directly outside of Suite 103 reads, "Acadian Diagnostic Laboratories LLC". ACADIAN's genetic testing results obtained and reviewed by Affiant list ACADIAN's premises at both 11606 Southfork Avenue, Suite 103, Baton Rouge, Louisiana 70816, and 11842 Justice Avenue, Baton Rouge, Louisiana 70816.

164.    On January 29, 2019, LDH conducted a site visit of Suite 103. According to inspection records provided by LDH, Suite 103 houses an operating diagnostic laboratory. ACADIAN's laboratory equipment, operational manuals, testing results, and other items were observed at this location. There is probable cause to believe that such items will be found at both 11606 Southfork Avenue, Suite 103, as well as 11842 Justice Avenue.

165.    According to Medicare enrollment documentation, ACADIAN identified that medical records would be stored at 11606 Southfork Avenue, Suite 103, Baton Rouge, Louisiana 70816.

166.    Suite 103 is also listed in Louisiana Secretary of State records as the principal place of business for other companies owned by WILKS and HANLEY, including ADL Consultant Group, LLC, Run to Wellness, LLC, and Hybrid Toxicology, LLC.

167.    The Investigative Team recently observed several employees' vehicles parked outside of Suites 102, 103, and 104, including Polly Cox, ACADIAN's Accounting Manager, Bridget Ringe, ACADIAN's Human Resources Administrator, Heather Wyatt ("Wyatt"), ACADIAN's Sales Support Associate, Jason Campagna, one of ACADIAN's Clinical Laboratory Scientists, and Indira Argueta, another one of ACADIAN's Clinical Laboratory Scientists.

168.    Based on emails reviewed by Affiant, Wyatt communicated regularly with ALLEN. On multiple occasions, Wyatt reached out to ALLEN to locate missing information for Lotus Health patients. Additionally, Wyatt would coordinate with ALLEN and others to send the necessary supplies, such as testing cups, for use in urine drug testing. Occasionally, Wyatt would also handle patient complaints. Based on a vehicle observed to be parked directly outside of Suite 104 that is registered to Wyatt, and observing that individual walk into Suite 104, it is believed that Wyatt's records and communications, such as the above, will be found in Suite 104.

169.    From observation outside of Building A, it appears to Affiant that Suite 104 is physically connected on the interior to Suites 102 and 103. During surveillance, the Investigative Team observed employees primarily use the door for Suite 102. This is supported by a note observed outside of Suite 103 asking the mail carrier to pick up mail from Suite 102. Additionally,

Affiant observed the same blue and white "Notice" signs that unauthorized persons are "prohibited" posted on the doors of each of Suites 102, 103, 104, and 501.

### iii.    11606 Southfork Avenue, Suites 500 and 501

170.    Finally, based on physical surveillance, across the parking lot from Suites 102 through 104, ACADIAN operates a premises at Suites 500 and 501, in "Building E."

171.    A sign posted directly outside of Suite 501 contains the logo for "Acadian Diagnostic Laboratories, LLC" and other companies known to be owned or operated by WILKS and HANLEY, similar to the sign discussed above that is located outside of Suite 102, and reads, "Marketing & Information Technology." There are no other signs posted or office suites located in Building E.

172.    In September 2019, the Investigative Team conducted surveillance and observed cars registered to several ACADIAN employees parked outside of Building E, including ACADIAN's Billing Specialist, Client Support Specialist, and Office Support Specialist. On September 18, 2019, the Investigative Team observed an individual believed to be ACADIAN's Billing Specialist enter Suite 500.

173.    Affiant also reviewed an email communication dated April 19, 2019, from the Office Support Specialist to ALLEN, asking for "missing information" on requisitions for cancer genetic testing that was "needed in order to bill out." Because the Investigative Team observed a car registered to ACADIAN's Office Support Specialist parked outside of Building E, it is believed that documents relating to billing for cancer genetic testing will be found in Suites 500 and 501.

174.    Finally, based on a review of property records, the Investigative Team determined that Suites 102, 103, 104, 500, and 501 are owned by Port Royal Properties, LLC. On September 24, 2019, the Investigative Team spoke with Richard Hedley, who is an officer and the registered

agent of Port Royal Properties, LLC. Hedley stated that through Port Royal Properties, he owns 11606 Southfork Avenue, Buildings A and E. He stated that an entity named Cypress Garden Investments, LLC leases Suites 102, 103, 104, 500, and 501 from him. Hedley knew HANLEY to be the owner of Cypress Garden Investments, LLC. Hedley stated that he has known HANLEY for a long time, and that HANLEY has been gradually acquiring additional leases from him, with HANLEY now leasing five suites.

175.   Therefore, based on the continued operation of ACADIAN for approximately seven years at the SUBJECT PREMISES, recent surveillance, interviews of witnesses, Medicare documentation, and other information, there is probable cause to believe that ACADIAN currently operates and maintains the evidence sought at the SUBJECT PREMISES.

## XII.   COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

176.   Affiant seeks authority to search all of the SUBJECT PREMISES to gather physical and electronic evidence concerning violations of federal law, that is, the TARGET OFFENSES.

177.   Based upon the training and experience of the Affiant, as well as information gathered during this investigation, it is known that a vast majority of medical providers, including ACADIAN, use computers as part of their businesses and store data in an electronic format. It is further known that ACADIAN submitted claims electronically to Medicare using a computer system.

178.   In addition, I know from my training and experience that individuals now commonly use cellular smart phones to conduct business. This includes the use of text messaging, email, and other applications to communicate for business purposes, as well as the use of electronic calendars to track appointments and meetings.

179.    WILKS, HANLEY, and other employees commonly used their cellular phones to conduct business and correspond regarding the schemes under investigation. Affiant reviewed numerous emails sent by HANLEY to ALLEN discussing cancer genetic testing, and such emails indicated that they were "Sent from my iPhone." To give an example, in the below exchange, HANLEY received an email regarding a patient complaining that she did not receive her genetic testing results. HANLEY forwarded the email to ALLEN, using his iPhone, asking if ALLEN could "look into this."



180.    In addition, in the course of this investigation, CW1 has placed recorded calls to WILKS and HANLEY on their cellular phones.  These conversations included discussions of cancer genetic testing.

181.    It is reasonable to believe, based on Affiant's review of emails sent via cellular phones, recorded calls placed to cellular phones, and the prevalence of cellular phones in today's age to communicate by voice, text, and email, that the owners and operators of ACADIAN used cellular phones in furtherance of the TARGET OFFENSES.  Accordingly, probable cause exists to search computers and electronic storage media found at the SUBJECT PREMISES for the records listed in Attachment B.

182.    The following paragraphs relate to the potential seizure of computer hardware, which may be necessary to obtain the material described in Attachment B.

183.    Affiant has consulted with Robby Godeaux, a Certified Forensic Computer Examiner with HHS-OIG, who has attended and completed several advanced courses relating to the seizure and processing of computers.  He has over thirteen years of experience as a forensic computer examiner.  Mr. Godeaux has informed the Affiant that, in order to properly retrieve and analyze all electronically stored (computer) data and to ensure accuracy and completeness of such data, and to prevent the loss of data either from accident or program destruction, both onsite and subsequent off-site laboratory analysis by a qualified computer specialist may be required.  To ensure that the search of computer data is both accurate and complete, agents must often seize all computer equipment and peripheral devices, the software to operate them, and related instruction manuals which contain directions concerning the operation of the computer system and software programs.  This is because the various parts of the computer system are often interdependent, and

the seizure of all relevant components is necessary if an analyst must reconstitute the system in a laboratory environment.

184.    Based on the Affiant's consultation with Mr. Godeaux, the Affiant knows that searching and seizing information from computers may require agents to seize most or all electronic storage devices to be imaged and searched later by qualified computer specialists in a laboratory or other controlled environment.  This requirement is due to the following:

- Technical requirements;

- Images or backups of computer data need to be restored to a separate computer and verified to ensure that files restore or copy properly.  Additionally, evidence may be encrypted, password protected, or may be in a format that could result in evidence being overwritten and/or destroyed electronically should an attempt be made to examine the electronic evidence on site;

- Due to the volume and nature of electronic evidence, a seemingly small media storage device can store the equivalent of thousands of pages of information or more; therefore, it may be impractical to attempt data analysis onsite.

185.    Based upon my own knowledge, training and experience, and consultation with other agents who have received specialized training in the use and application of computers, I know that in order to retrieve data maintained in computer hardware or software completely and accurately, all computer documentation and equipment, peripherals, related instruction in the form of manuals and notes, as well as all of the software utilized to operate such a computer, should be seized and subsequently processed by a qualified computer specialist.

186.    Upon securing the SUBJECT PREMISES, law enforcement personnel trained in searching and seizing computer data will access any computer equipment and storage devices to determine whether these items can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve data. If computer personnel determine that these items cannot be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve data, the agents will seize the computer equipment and storage devices for the purposes of conducting an off-site search, consistent with Federal Rule of Criminal Procedure 41(e)(2)(B).

187.    Accordingly, Affiant requests permission to seize computer equipment and storage devices if it appears reasonably necessary to obtain the evidence described in Attachment B, and if reasonably necessary, to conduct an off-site search pursuant to Federal Rule of Criminal Procedure 41(e)(2)(B).

## XIII.  AVOIDING UNNECESSARY DISRUPTION TO BUSINESS OPERATIONS

188.    ACADIAN is a functioning business. As with any search warrant, I expect that this warrant will be executed reasonably. Reasonable execution will likely involve conducting an investigation on the scene of what computers or storage media must be seized or copied, and what computers or storage media need not be seized or copied. Where appropriate, agents will copy data, rather than physically seize computers or storage media, to reduce the extent of disruption.

## XIV.  CONCLUSION

189.    Based upon the above information, probable cause exists to believe there has been a violation of federal laws, specifically, the TARGET OFFENSES, and that evidence of those violations exists and is located at the SUBJECT PREMISES.

190.    In consideration of the foregoing, I respectfully request that this Court issue a search warrant for the SUBJECT PREMISES, authorizing a search of the locations described in

Attachment A, and the seizure of items described in Attachment B.

Respectfully submitted,

Wes Root
Special Agent
U.S. Department of Health and Human Services
Office of Inspector General

Sworn to and subscribed before me this 24ᵗʰ day of September, 2019.

HONORABLE RICHARD L. BOURGEOIS, JR.
UNITED STATES MAGISTRATE JUDGE
MIDDLE DISTRICT OF LOUISIANA

**ATTACHMENT A**
**PREMISES TO BE SEARCHED**

1.      The premises to be searched is the SUBJECT PREMISES, which consists of the following location:

>       a.      The current business location, inclusive of all buildings, structures, and appurtenances thereof, for Acadian Diagnostic Laboratories, LLC ("ACADIAN"), at 11842 Justice Avenue, Baton Rouge, Louisiana 70816.

2.      The SUBJECT PREMISES is a single building located on the south side of Justice Avenue, approximately 200 yards east of the intersection of South Sherwood Boulevard and Justice Avenue.  It is brick building with a gray roof and dark brown poles in the front.  At the entrance to the parking lot there is a sign for ACADIAN.  There is another such sign mounted on the brick outside of the front door.  ACADIAN is believed to be the only tenant in the building. Below are photos of the SUBJECT PREMISES from Justice Avenue.





3.    The search will include secretarial areas, document storage areas, desks, filing cabinets, filing containers, and safes at the SUBJECT PREMISES large enough to contain notes, memoranda, correspondence, reports, other records and documents, cellular phones, computers, and data storage media, and all computer rooms and areas (including the contents of any network or email servers).

**ATTACHMENT B**
**ITEMS TO BE SEIZED**

1.    Evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section

1347 (Health Care Fraud), Title 18, United States Code, Section 1349 (Conspiracy to

Commit Health Care Fraud), and Title 42, United States Code, Section 1320a-7b

(Soliciting and Receiving Kickbacks Involving a Federal Health Care Program), those

violations involving Acadian Diagnostic Laboratories, LLC ("ACADIAN") and its

owners, operators, and employees, from September 2016 to the present, including the

following:

a.    Documents relating to the referral of patients to or from ACADIAN, Lotus Health

Telemed LLC, Archer Diagnostics LLC, JL Management, LLC, or JL Billing;

b.    Documents relating to the treatment of patients, including medical records, patient

files, diagnostic testing records, drug testing records, test results, physician notes,

technician notes, radiographs and images, office visit notes, examination and

procedure notes, calendars, patient appointment records, appointment books,

patient sign-in sheets, and physician and employee schedules;

c.    Documents relating to the ordering of testing, testing, and billing for testing, as well

as documents relating to the purchase, establishment, ownership, use, maintenance

of, and inspection of testing devices and machines;

d.    Invoices and supporting documentation evidencing monies owed to or received

from any of the above referenced businesses or their owners and operators;

e.    Contracts, billing agreements, professional services agreements, or any other

contracts between the above-referenced businesses or their owners and operators,

and any other individual, company, physician or billing company;

3

f.   Documents relating to marketers and sales representatives contracted with or paid by ACADIAN, such as commission logs and reports.

g.   Documents relating to the payment or collection of payment for services rendered, whether by insurance, co-payment, cash, or otherwise, including receipts, receipt books, ledgers documenting payments made or received, and any cash register or credit card reader printouts or receipts;

h.   Insurance records, including documents relating to the submission of insurance claims for reimbursement, the acceptance or denial of such claims, and the receipt and deposit of reimbursements, including but not limited to Medicare insurance claims forms, supporting documentation, correspondence, and records of insurance payments received;

i.   Documents relating to patient billings, such as itemized billing records, Explanation of Benefit forms, and correspondence to and from patients;

j.   Documents concerning the computer billing system, or any other methods of posting charges manually or otherwise, preparing invoices, making adjustments or alterations in billing, generating billing reports, or other procedural operations associated with the tracking of services rendered and billing, including account receivable journals and ledgers;

k.   Insurance training manuals, provider manuals, regulations, bulletins, reports, newsletters, notices, pamphlets, handbooks, and correspondence relating to proper billing and documentation procedures and any documents regarding instructions for billing insurance providers or carriers, such as Medicare;

l.   Documents relating to any public or private insurance audits, such as notifications

from insurance providers requesting supporting documentation, alerts regarding billing and coding practices, audit findings, documents relating to overpayment recoveries, and related correspondence;

m.  Employee files and personnel files of all employees or contractors, including licensed medical professionals, medical assistants, coding/billing staff, and administrative staff, such as applications for employment, employment contracts, employee and contactor work schedules, salaries and compensation, bonuses, time sheets, reference/background checks, professional certifications, training, performance evaluations, disciplinary actions, improvement plans, and payroll records;

n.  Employee training materials—formal or informal—including marketing materials, manuals, guides, memoranda, notes, emails, and other materials that provide employees information about how to perform their job functions;

o.  Policies, internal guidelines, standards of practice, and procedures for the practice of medicine;

p.  Bank and credit account records, wire transfer records, bank statements, tax records, tax returns, safe deposit box keys and records, vault keys, safes, money wrappers, money containers, financial records, and notes showing payment, receipt, concealment, transfer, or movement of money;

q.  Documents identifying any financial accounts under the control of ACADIAN and its owners and employees, including but limited to bank ledgers, deposit slips, investment and retirement accounts, stocks, bonds or other financial instruments;

r.  Documents identifying receipt, transfer, or disposition of proceeds;

5

s.   Documents identifying any businesses or corporations in which ACADIAN and its owners and employees have a financial relationship with, investment stake in, ownership of, controlling interest of, or management in, including, but not limited to, contracts, articles of incorporations, shareholder agreements, offering memoranda, or memoranda of understanding;

t.   Documents, contracts, or agreements between ACADIAN and any third party, including, but not limited to independent contractor agreements;

u.   Records of mail and communications services, cellular phones, answering machines or services, telephone paging devices, beepers, car telephones, Blackberry devices, or other communication devices; and

v.   Computers or storage media capable of being used to commit the offenses, further the activity, or store evidence, including computer-generated or stored documents reflecting information such as patient information, medical records, billing or payment information, financial records, medical tests and results, appointments, or insurance records of the patients.

2.   For any computer, computer hard drive, or other physical object upon which computer data can be recorded (hereinafter, "computer") that is called for by this warrant, or that might contain things otherwise called for by this warrant, in addition to items 1(a) through 1(u) above:

a.   Evidence of who used, owned, or controlled the computer at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs,

photographs, and correspondence;

b.    Evidence of software that would allow others to control the computer, such as viruses, Trojan horses, and other forms of malicious software, or evidence of the lack of such malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.    Evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to the crimes under investigation and to the computer user;

d.    Evidence of the attachment to the computer of other storage devices or similar containers for electronic evidence;

e.    Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the computer;

f.    Evidence of the times the computer was used;

g.    Passwords, encryption keys, and other access devices that may be necessary to access the computer;

h.    Documentation and manuals that may be necessary to access the computer or to conduct a forensic examination of the computer;

i.    Records of or information about Internet Protocol addresses used by the computer;

j.    Records of or information about the computer's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

k.    Contextual information to understand the evidence described in this attachment.

3.    As used above, the terms "records," "documents," "files," and "information" include all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

4.    The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions for electronically stored information, including desktop computers, notebook computers, cellular phones, mobile devices such as smart phones and tablets, server computers, virtual computer systems, and network hardware.

5.    The term "storage media" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, subscriber identity module ("SIM") cards, and other magnetic or optical media.

COPY

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT
### for the
Middle District of Louisiana

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) |
| The Premises Known as Acadian Diagnostic Laboratories, LLC, 11842 Justice Avenue, Baton Rouge, Louisiana 70816 | ) ) ) |

Case No.   19- mj-111

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Middle_____ District of _____Louisiana_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before ___October 8, 2019___ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.      ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Hon. Richard L. Bourgeois, Jr._____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*    ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:    9/24/19 at 3:00pm

*Judge's Signature*

City and state:      Baton Rouge, Louisiana            Hon. Richard L. Bourgeois, Jr., U.S. Magistrate Judge
*Printed name and title*

**ATTACHMENT A**
**PREMISES TO BE SEARCHED**

1.    The premises to be searched is the SUBJECT PREMISES, which consists of the

following location:

        a.    The current business location, inclusive of all buildings, structures, and

        appurtenances thereof, for Acadian Diagnostic Laboratories, LLC

        ("ACADIAN"), at 11842 Justice Avenue, Baton Rouge, Louisiana 70816.

2.    The SUBJECT PREMISES is a single building located on the south side of Justice

Avenue, approximately 200 yards east of the intersection of South Sherwood Boulevard and

Justice Avenue. It is brick building with a gray roof and dark brown poles in the front. At the

entrance to the parking lot there is a sign for ACADIAN. There is another such sign mounted on

the brick outside of the front door. ACADIAN is believed to be the only tenant in the building.

Below are photos of the SUBJECT PREMISES from Justice Avenue.





3.      The search will include secretarial areas, document storage areas, desks, filing cabinets, filing containers, and safes at the SUBJECT PREMISES large enough to contain notes, memoranda, correspondence, reports, other records and documents, cellular phones, computers, and data storage media, and all computer rooms and areas (including the contents of any network or email servers).

## ATTACHMENT B
## ITEMS TO BE SEIZED

1.  Evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 1347 (Health Care Fraud), Title 18, United States Code, Section 1349 (Conspiracy to Commit Health Care Fraud), and Title 42, United States Code, Section 1320a-7b (Soliciting and Receiving Kickbacks Involving a Federal Health Care Program), those violations involving Acadian Diagnostic Laboratories, LLC ("ACADIAN") and its owners, operators, and employees, from September 2016 to the present, including the following:

    a.  Documents relating to the referral of patients to or from ACADIAN, Lotus Health Telemed LLC, Archer Diagnostics LLC, JL Management, LLC, or JL Billing;

    b.  Documents relating to the treatment of patients, including medical records, patient files, diagnostic testing records, drug testing records, test results, physician notes, technician notes, radiographs and images, office visit notes, examination and procedure notes, calendars, patient appointment records, appointment books, patient sign-in sheets, and physician and employee schedules;

    c.  Documents relating to the ordering of testing, testing, and billing for testing, as well as documents relating to the purchase, establishment, ownership, use, maintenance of, and inspection of testing devices and machines;

    d.  Invoices and supporting documentation evidencing monies owed to or received from any of the above referenced businesses or their owners and operators;

    e.  Contracts, billing agreements, professional services agreements, or any other contracts between the above-referenced businesses or their owners and operators, and any other individual, company, physician or billing company;

f.    Documents relating to marketers and sales representatives contracted with or paid by ACADIAN, such as commission logs and reports.

g.    Documents relating to the payment or collection of payment for services rendered, whether by insurance, co-payment, cash, or otherwise, including receipts, receipt books, ledgers documenting payments made or received, and any cash register or credit card reader printouts or receipts;

h.    Insurance records, including documents relating to the submission of insurance claims for reimbursement, the acceptance or denial of such claims, and the receipt and deposit of reimbursements, including but not limited to Medicare insurance claims forms, supporting documentation, correspondence, and records of insurance payments received;

i.    Documents relating to patient billings, such as itemized billing records, Explanation of Benefit forms, and correspondence to and from patients;

j.    Documents concerning the computer billing system, or any other methods of posting charges manually or otherwise, preparing invoices, making adjustments or alterations in billing, generating billing reports, or other procedural operations associated with the tracking of services rendered and billing, including account receivable journals and ledgers;

k.    Insurance training manuals, provider manuals, regulations, bulletins, reports, newsletters, notices, pamphlets, handbooks, and correspondence relating to proper billing and documentation procedures and any documents regarding instructions for billing insurance providers or carriers, such as Medicare;

l.    Documents relating to any public or private insurance audits, such as notifications

4

from insurance providers requesting supporting documentation, alerts regarding billing and coding practices, audit findings, documents relating to overpayment recoveries, and related correspondence;

m.    Employee files and personnel files of all employees or contractors, including licensed medical professionals, medical assistants, coding/billing staff, and administrative staff, such as applications for employment, employment contracts, employee and contactor work schedules, salaries and compensation, bonuses, time sheets, reference/background checks, professional certifications, training, performance evaluations, disciplinary actions, improvement plans, and payroll records;

n.    Employee training materials—formal or informal—including marketing materials, manuals, guides, memoranda, notes, emails, and other materials that provide employees information about how to perform their job functions;

o.    Policies, internal guidelines, standards of practice, and procedures for the practice of medicine;

p.    Bank and credit account records, wire transfer records, bank statements, tax records, tax returns, safe deposit box keys and records, vault keys, safes, money wrappers, money containers, financial records, and notes showing payment, receipt, concealment, transfer, or movement of money;

q.    Documents identifying any financial accounts under the control of ACADIAN and its owners and employees, including but limited to bank ledgers, deposit slips, investment and retirement accounts, stocks, bonds or other financial instruments;

r.    Documents identifying receipt, transfer, or disposition of proceeds;

5

s.      Documents identifying any businesses or corporations in which ACADIAN and its owners and employees have a financial relationship with, investment stake in, ownership of, controlling interest of, or management in, including, but not limited to, contracts, articles of incorporations, shareholder agreements, offering memoranda, or memoranda of understanding;

t.      Documents, contracts, or agreements between ACADIAN and any third party, including, but not limited to independent contractor agreements;

u.      Records of mail and communications services, cellular phones, answering machines or services, telephone paging devices, beepers, car telephones, Blackberry devices, or other communication devices; and

v.      Computers or storage media capable of being used to commit the offenses, further the activity, or store evidence, including computer-generated or stored documents reflecting information such as patient information, medical records, billing or payment information, financial records, medical tests and results, appointments, or insurance records of the patients.

2.   For any computer, computer hard drive, or other physical object upon which computer data can be recorded (hereinafter, "computer") that is called for by this warrant, or that might contain things otherwise called for by this warrant, in addition to items 1(a) through 1(u) above:

a.      Evidence of who used, owned, or controlled the computer at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs,

6

photographs, and correspondence;

b.    Evidence of software that would allow others to control the computer, such as viruses, Trojan horses, and other forms of malicious software, or evidence of the lack of such malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.    Evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to the crimes under investigation and to the computer user;

d.    Evidence of the attachment to the computer of other storage devices or similar containers for electronic evidence;

e.    Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the computer;

f.    Evidence of the times the computer was used;

g.    Passwords, encryption keys, and other access devices that may be necessary to access the computer;

h.    Documentation and manuals that may be necessary to access the computer or to conduct a forensic examination of the computer;

i.    Records of or information about Internet Protocol addresses used by the computer;

j.    Records of or information about the computer's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

k.    Contextual information to understand the evidence described in this attachment.

3.  As used above, the terms "records," "documents," "files," and "information" include all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

4.  The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions for electronically stored information, including desktop computers, notebook computers, cellular phones, mobile devices such as smart phones and tablets, server computers, virtual computer systems, and network hardware.

5.  The term "storage media" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, subscriber identity module ("SIM") cards, and other magnetic or optical media.